IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Carlos Arias, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Sling TV, LLC d/b/a Sling<br><br>Defendant. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Carlos Arias ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Sling TV LLC ("Defendant"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on his personal knowledge.

## NATURE OF THE ACTION

1. Defendant Sling TV, LLC. d/b/a Sling ("Sling") is one of the largest video streams and pre-recorded video content providers in the United States. Defendant owns and operates its online and mobile streaming applications ("apps"), including www.sling.com (the "Website"). Unbeknownst to Plaintiff and the Class Members, Defendant knowingly and intentionally discloses its users' personally identifiable information—including a record of every video viewed by the user—to an unauthorized third party without first complying with the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710.

2. Defendant's Website and apps use first-party and third-party cookies, software development kits ("SDK"), pixels, Facebook's Business Tools, including Advanced Matching and Conversion API, and related tracking tools to purposely track, record, and transmit its digital

subscribers' interactions on Defendant's Website.

3. Defendant knowingly installed and used these tools, and it controlled which data was transmitted to an unrelated third party. In conjunction with this, Defendant purposefully and specifically chose to: (1) track and record consumers' renting and streaming of its video offerings, (2) disclose that information to Facebook[1] alongside its digital subscribers' individual Facebook ID ("FID") and other persistent identifiers, and (3) did this without its users' knowledge or consent via surreptitious technology.

4. Importantly, when Defendant transmitted Plaintiff's and other consumers' Personal Viewing Information—*i.e.*, their persistent FID and consumption of video content—that information was combined and sent to Facebook as one data point, thereby revealing the identity of the individual who requested or viewed a specific video.

5. Because a FID is used to identify a specific individual and their corresponding Facebook account, Facebook and any ordinary person can use it to locate, access, and view a particular digital subscriber's Facebook profile, thereby revealing their identity. Put simply, the information that Defendant shares with Facebook reveals each and every video a particular digital subscriber has requested or viewed.

6. Plaintiff and the proposed class members were harmed by Defendant's unlawful conduct, which deprives them of their right to privacy in their own homes, and the disclosures at issue reveal highly personal details regarding their unique video requests and viewing habits.

---

[1] Notably, the Facebook Pixel works in conjunction with its Conversion API tool and, as a result, Defendant transmits one copy of its digital subscribers' viewing information directly from its web server to Meta's web servers. Additional copies of this information are also communicated through the use of cookies.

**JURISDICTION AND VENUE**

7. This Court has original jurisdiction under 28 U.S.C. § 1331 based on Plaintiff's claims under the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.* This Court also has subject matter jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because this is a proposed class action in which: (1) there are at least 100 Class Members; (2) the combined claims of Class Members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs; and (3) Defendant and at least one Class member are domiciled in different states.

8. This Court also has personal jurisdiction over Defendant because it conducts and transacts business in the state of New York, contracts with vendors to operate its Website within the state of New York, and provides services, including its Website, within the state of New York. Furthermore, this Court has personal jurisdiction over Defendant because its Website collected and disseminated Plaintiff's personally identifiable information giving rise to this lawsuit in this District, and the conduct giving rise to this action arises out of and relates to that business.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant conducts substantial business in this District and a substantial part of the events giving rise to Plaintiff's claims took place within this District.

**PARTIES**

10. Plaintiff Carlos Arias is a citizen of New York, who resides in Manhattan, New York. Plaintiff has had a paid account with Sling, which Plaintiff used to watch video content on his computer on a regular basis within the last two years since the filing of this Complaint. Throughout the duration of Plaintiff's interactions with Defendant's Website, Plaintiff has

3

maintained and used his Facebook account, which he accessed on the same web browser that he used to request and view Sling video content on the Website. Pursuant to the systematic process described herein, Plaintiff's Personal Viewing Information was sent to an unauthorized third party—Facebook—without Plaintiff's knowledge or consent each time Plaintiff rented and viewed Sling's video content through the Website. Plaintiff never gave Defendant express written consent to disclose his Personal Viewing Information to Facebook or any other unauthorized third party.

11. Defendant Sling TV, LLC is a Colorado corporation with its principal place of business located in Englewood, Colorado.

## GENERAL ALLEGATIONS

*History and Overview of the VPPA*

12. The impetus for the VPPA began with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court. During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that record. Congress responded by passing the VPPA, with an eye toward the digital future. As Senator Patrick Leahy, who introduced the Act, explained:

> "It is nobody's business what Oliver North or Pratik Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong".

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

4

13. In 2012, Congress amended the VPPA, and in so doing, reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

14. The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information ("PII") as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

***Defendant is a Video Tape Service Provider***

15. Defendant is an industry-leading digital video store whose primary business is the streaming of live and prerecorded movies and TV shows which it offers to millions of users through its www.sling.com (the "Website") and online and mobile streaming applications ("apps"). In essence, Defendant is a digital version of the now obsolete Blockbuster brick-and-mortar stores.

16. Defendant monetizes this content and its platforms by restricting access to its video services, and only those who register with Defendant are granted access to it.

17. To subscribe to Defendant's services, at a minimum, individuals must create and pay for an online account and share their identifying information. Thereafter, subscribers can watch Defendant's movies and TV shows. Defendant permits its users to stream their video

content directly on the Website and the apps.

***Defendant Knowingly Discloses Consumers' PII To a Third-Party***

18. When subscribers request or view videos on Defendant's Website and apps, their Personal Viewing Information is transmitted to Facebook as a result of the tracking tools that Defendant purposely installed and implemented on its Website and apps. Defendant controlled its Website, apps, and all of the tracking technologies that it used to transmit its subscribers' Personal Viewing Information to unauthorized parties. Importantly, Facebook would not have received Plaintiff's or the Class Members' Personal Viewing Information but for Defendant's decision to install and use Facebook's Business Tools, including the Facebook Pixel and Conversions API, and other tracking technologies on its Website and apps.

19. Moreover, Defendant controlled which data was tracked, recorded, and transmitted when its subscribers requested or viewed its video content.

20. Defendant's knowledge as to its conduct is evidenced by the fact that: (1) it chose to track its digital subscribers' interactions with the Website and apps, including their viewing of videos; (2) it requested and installed lines of code that achieved this purpose; (3) it obtained the lines of code from Facebook in order to achieve this purpose; and (4) it controlled the information that was tracked, recorded, and transmitted via the Website and the apps.

***Defendant's Use of Tracking Tools***

21. Facebook is a real identity platform, meaning that users are allowed only one account and must share the name they go by in everyday life. To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.

22. Businesses, such as Defendant, use Facebook's Business Tools to monitor and record their website and app visitors' devices and specific activities for marketing purposes.

6

23.     More specifically, the Facebook pixel that Defendant installed and used tracked, recorded, and sent Facebook its subscribers' granular Website and apps activity, including the names of specific videos that subscribers requested and/or viewed each time through Defendant's Website and apps. The information is not merely metadata.

24.     Defendant's motivation for using the Facebook Pixel and related Facebook Business Tools is simple—it financially benefits Defendant in the form of advertising and information services that Defendant would otherwise have to pay for.

25.     The information Facebook receives from Defendant identifies subscribers based on their unique and persistent Facebook IDs ("FID"), which is sent to Facebook as one data point alongside the title of the video content the specific subscriber requested or viewed.

26.     Notably, these marketing tools are not required for Defendant's Website or apps to function properly. Even if it finds the tools helpful, it could have used them in a manner that does not reveal its subscribers' Personal Viewing Information.

27.     Any ordinary person who comes into possession of a Facebook ID can easily use that information to identify a particular individual and their corresponding Facebook profile, which contains additional information such as the user's name, gender, birthday, place of residence, career, educational history, a multitude of photos, and the content of a Facebook user's posts. This information may reveal even more sensitive personal information—for instance, posted photos may disclose the identity of family members, and written posts may disclose religious preferences, political affiliations, personal interests, and more.

28.     At a minimum, Facebook received Plaintiff's Personal Viewing Information as a result of Defendant's data-sharing practices and the tools it installed on its platforms.

*Defendant's Use of Tracking Tools*

29. When Defendant's subscribers request or view a particular video, the specific title of the video is transmitted to Facebook alongside the subscribers' persistent and unique Facebook ID, thereby revealing their Personal Viewing Information to Facebook.

30. However, subscribers are unaware of this because, amongst other things, Defendant's transmissions are completely invisible to ordinary subscribers viewing its webpages. Figures 2 and 3 are an attempt at lifting the curtain to show precisely what happens behind the scenes when Plaintiff and the Class Members request or view video content on Defendant's Website.

31. While Figure 1 shows what ordinary subscribers see on their screens as they use the Website, Figures 2-3 show the invisible, behind-the-scenes transmissions taking place.

**[Intentionally Left Black]**



*Figure 1. The image above is a screenshot of the title screen that shows what subscribers see when they watch a video, like a movie or show, via Defendant's Website. The page does not contain any logos or indications that their interactions are recorded and sent to Facebook.*

32.     The lines of text embedded in Figure 2 plainly show that Defendant sends Facebook the specific URL assigned to a video (which any person can copy and paste into a web browser to identify the exact video being requested) and the subscriber's FID (which any person can use to identify a Facebook user) when the user rents the movie shown above via the Website.

**[Intentionally Left Blank]**



*Figure 2. The images above represent a screenshot of a network traffic report that was taken when a subscriber watched video content via Defendant's Website, at which time the personal viewing information was transmitted to Facebook.*

33.     The string of numbers contained in the first line of text within Figure 2 ("id=100069197062755") corresponds to a Defendant's own Facebook identifiers, thereby demonstrating it has indeed installed the Facebook Pixel on its Website. The video viewer's FID

10

was also transmitted to Facebook via the Website, and it is contained in the unredacted "c_user=" cookie in the second image of Figure 2.

34.     Notably, the URL sent to Facebook also indicates that (1) a user has viewed the video ("PageView"); and (2) the exact ID of the video ("https://watch.sling.com/1/asset/430521a090aadf5587a6e5b4d59e1ff2/watch").

35.     Additionally, Figure 3 below demonstrates that Facebook received Plaintiff's and Class Members' Personal Viewing Information via sling.com and that the data was attributed to specific subscribers' unique Facebook accounts each time they requested video content.



*Figure 3. Screenshot taken from the user's personal Facebook account.*

36.     The image in Figure 3, which is a screenshot taken from a subscriber's personal Facebook account, plainly states: "sling.com has shared this activity with us using Meta Business

11

Tools."

37. In addition to the Facebook Pixel transmission shown in Figures 1-4 above, Defendant also transmits its subscribers' Personal Viewing Information to Facebook via Conversions API and SDKs installed on its Website and apps.

38. In summary, Defendant discloses information to Facebook that makes it reasonably and foreseeably likely that Facebook could identify which specific user requested or obtained any specific video from Defendant's Website and apps.

39. The personal information that Defendant obtained from Plaintiff and the Class Members is valuable data in the digital advertising-related market for consumer information.

40. At no point did Plaintiff or the Class Members consent to Defendant's disclosure of their video viewing history to a third party. As such, Defendant deprived Plaintiff and the Class Members of their privacy rights and control over their personal information.

41. The harms described above are aggravated by Defendant's continued retention and commercial use of Plaintiff's and the Class Members' personal information, including their private video viewing histories.

## CLASS ACTION ALLEGATIONS

42. Plaintiff brings this action on behalf of himself and all other similarly situated persons pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), and (b)(3). Specifically, the Class is defined as:

> All persons in the United States who, during the maximum period of time permitted by law, logged in to Defendant's Website or applications and viewed prerecorded content using their mobile or computer browsers.

43. The Class does not include (1) Defendant, its officers, and/or its directors; or (2)

the Judge to whom this case is assigned and the Judge's staff.

44.     Plaintiff reserves the right to amend the above class definition and add additional classes and subclasses as appropriate based on investigation, discovery, and the specific theories of liability.

45.     ***Community of Interest***: There is a well-defined community of interest among members of the Class, and the disposition of the claims of these members of the Class in a single action will provide substantial benefits to all parties and to the Court.

46.     ***Numerosity***: While the exact number of members of the Class is unknown to Plaintiff at this time and can only be determined by appropriate discovery, upon information and belief, members of the Class number in the millions. Members of the Class may also be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

47.     ***Existence and predominance of common questions of law and fact***: Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individuals of the Class. These common legal and factual questions include, but are not limited to:

(a)     Whether Defendant collected Plaintiff's and the Class Members' PII;

(b)     Whether Defendant unlawfully disclosed and continues to disclose its users' PII, including their video viewing records, in violation of the VPPA;

(c)     Whether Defendant's disclosures were committed knowingly; and

(d)     Whether Defendant disclosed Plaintiff's and the Class Members' PII without consent.

48.     ***Typicality:*** Plaintiff's claims are typical of those of the Classes because Plaintiff,

like all members of the Classes, rented and watched videos on Defendant's Website and had his PII collected and disclosed by Defendant to third parties.

49. *Adequacy*: Plaintiff will fairly and adequately represent and protect the interests of the Class as required by Federal Rule of Civil Procedure Rule 23(a)(4). Plaintiff is an adequate representative of the Class because he has no interests which are adverse to the interests of the members of the Class. Plaintiff is committed to the vigorous prosecution of this action and, to that end, Plaintiff has retained skilled and experienced counsel.

50. Moreover, the proposed Classes can be maintained because they satisfy both Rule 23(a) and 23(b)(3) because questions of law or fact common to the Classes predominate over any questions affecting only individual members and a Class Action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

(a) The expense and burden of individual litigation makes it economically unfeasible for members of the Classes to seek to redress their claims other than through the procedure of a class action;

(b) If separate actions were brought by individual members of the Class, the resulting duplicity of lawsuits would cause members of the Class to seek to redress their claims other than through the procedure of a class action; and

(c) Absent a class action, Defendant likely will retain the benefits of its wrongdoing, and there would be a failure of justice.

## CAUSES OF ACTION

### COUNT I
### Violation of the Video Privacy Protection Act
### 18 U.S.C. § 2710, *et seq.*

51. Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

52. The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally-identifiable information" concerning any "consumer" to a third party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

53. As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials." Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it engaged in the business of renting and delivering audiovisual materials—including the prerecorded videos that Plaintiff and the Class Members rented and viewed on the Website and apps—and those deliveries affect interstate or foreign commerce.

54. As defined in 18 U.S.C. § 2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." Plaintiff and the Class Members are "consumers" because they rented and subscribed to Defendant's Website and apps, which provide video content to users in exchange payment from users. In so doing, Plaintiff and the Class Members created an account to access Defendant's Website and apps and provided Defendant, at a minimum, their names, emails, addresses, credit card information, and other persistent cookies containing their PII, including the title of the videos they purchased, rented,

15

and/or viewed.

55. Defendant knowingly caused Plaintiff's and the Class Members' Personal Viewing Information, as well as the above-referenced unique identifiers, to be disclosed to a third party, Facebook. This information constitutes "personally identifiable information" under 18 U.S.C. § 2710(a)(3) because it identified each Plaintiff and Class member to Facebook as individuals who viewed Defendant's video content, including the specific prerecorded video materials rented and watched on the Website and apps. This information allowed Facebook to identify each Plaintiff's and Class Member's specific video viewing preferences and habits.

56. As set forth in 18 U.S.C. § 2710(b)(2)(B), "informed, written consent" must be (1) "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer;" and (2) "at the election of the consumer…is either given at the time the disclosure is sought or is given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner." Defendant failed to obtain informed, written consent from Plaintiff and the Class Members under this definition.

57. Defendant was aware that the disclosures to a third party that it shared through the tracking software it incorporated in its Website and apps identified Plaintiff and the Class Members. Indeed, both Facebook publicly touts its ability to connect PII to individual user profiles. Defendant also knew that Plaintiff's and the Class Members' Personal Viewing Information was disclosed to a third party because Defendant programmed the tracking software into the Website's and apps' code so that a third party would receive the video titles and subscriber's unique third-party identifiers when a subscriber rented or watched a prerecorded video on the Website or apps. The purpose of those trackers was to obtain identifiable analytics and intelligence for Defendant about its user base, while also benefiting Facebook, by providing

16

them with additional data that they can leverage for their advertising, analytics and/or other services.

58. Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA. In particular, the Website's and app's disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

59. On behalf of himself and the Class Members, Plaintiff seeks declaratory relief, statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c), and reasonable attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a) For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure; naming Plaintiff as representative of the Class; and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b) For an order declaring that Defendant's conduct violates the statute referenced herein;

(c) For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(c) For compensatory, statutory and punitive damages in amounts to be determined by the Court and/or jury;

(d) For prejudgment interest on all amounts awarded;

(e) For an order of restitution and all other forms of equitable monetary relief; and

(f) For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: July 19, 2024                                   Respectfully submitted,

**GUCOVSCHI ROZENSHTEYN, PLLC**

By: /s/ Adrian Gucovschi
     Adrian Gucovschi, Esq.

Adrian Gucovschi
Benjamin Rozenshteyn
140 Broadway, FL 46
New York, NY 10005
Tel: (212) 884-4230
Email: adrian@gr-firm.com
           ben@gr-firm.com

*Counsel for Plaintiff and the Class*